UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERTO L. LILLO, | ) | Case No. 1:16cv1841 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | REPORT AND RECOMMENDATION |

Plaintiff Roberto L. Lillo ("Lillo" or "claimant") challenges the final decision of

Defendant Commissioner of Social Security ("Commissioner"), denying his application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§

416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned United States Magistrate Judge pursuant to an automatic

referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth

below, the Magistrate Judge recommends that the Commissioner's final decision be

REMANDED.

I.      PROCEDURAL HISTORY

On March 28, 2011, and March 13, 2013, Lillo protectively filed applications for SSI

benefits[1]. (R. 10, PageID #: 12, 254-262.) He stated that his disability began on April 18, 1990.

*Id.* at 12, 254, 160. Lillo listed his physical or mental conditions that limit his ability to work as

---

[1] Lillo's initial application was denied on August 16, 2011, but no appeal was taken at that time.
(R. 10, PageID #: 80, 193-195, 145-159.)

"Bipolar; depression; ADHD." *Id.* at 312, 160. Lillo's applications were denied initially and upon reconsideration. *Id.* at 145-159, 160-175, 196-198, 176-192. Thereafter, Lillo filed a written request for a hearing before an administrative law judge ("ALJ"). *Id.* at 211. The ALJ convened a hearing on April 2, 2015, to hear Lillo's case. *Id.* at 103-143. Lillo appeared at the hearing, was represented by counsel, and testified. *Id.* at 105. A vocational expert ("VE") also attended the hearing and provided testimony. *Id.* at 105, 130-140.

On May 12, 2015, the ALJ issued her decision, applying the standard five-step sequential analysis to determine whether Lillo was disabled. *Id.* at 77-95; *see generally* 20 C.F.R. § 416.920(a).) Based on her review, the ALJ concluded Lillo was not disabled. *Id.* at 81, 95. The Appeals Council denied Lillo's request for review, thus rendering the ALJ's decision the final decision of the Commissioner. *Id.* at 69-71.

Lillo now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). The parties have completed briefing in this case. (R. 12, 14, 16.)

## II.    PERSONAL BACKGROUND INFORMATION

Lillo was born on April 18, 1988, and was 25 years old as of the 2013 application date. (R. 10, PageID #: 254, 309.) Accordingly, Lillo was considered a "younger person" for Social Security purposes. *See* 20 C.F.R. § 404.1563(c). Lillo has less than a ninth grade education, and is able to communicate in English. ((R. 10, PageID #: 93, 313, 311).

III.    RELEVANT MEDICAL EVIDENCE[2]

A.  Treatment Records

Disputed issues will be discussed as they arise in Lillo's brief alleging errors by the ALJ. Lillo's application for SSI benefits listed bipolar, depression, and ADHD as the physical or mental conditions that limit his ability to work. (R. 10, PageID #: 312, 160.)

Lillo began treating with Carlos Elguero, M.D., on April 2, 2012, for bipolar disorder and attention deficit disorder. (*Id.* at 455-460.) Lillo reported to Dr. Elguero that he had been treated for ADHD and bipolar disorder at "Metro[3]" in 2003, but has had no treatment since then. Lillo denied any alcohol usage, but indicated he used marijuana to calm himself down. He reported his mind was racing, his moods were up and down, and that he slept only two to three hours daily. *Id.* at 458. Dr. Elguero prescribed Lamotrigine (Lamictal) for the bipolar disorder. *Id.* at 460.

On April 24, 2012, Lillo reported to Dr. Elguero that he was hearing voices with the Lamictal, and Dr. Elguero changed his prescription to Divalproex (Depakote). (R. 10, PageID #: 453, 455.) Although Lillo continued to have interrupted sleep, and his girlfriend said he could be "explosive," his mood and affect were normal at the visit. *Id.* at 453-454.

At a follow-up visit with Dr. Elguero on July 27, 2012, Lillo stated that he felt less explosive and more calm with the Depakote medication. He continued to smoke cigarettes and marijuana, however. (R. 10, PageID #: 444, 447.) Again, he had a normal mood and affect at the appointment, and his thought content, cognition, and memory were all normal, although he was

---

[2]  The summary of relevant medical evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties *and* also deemed relevant by the court to the assignments of error raised.

[3]  Presumably, MetroHealth Medical Center in Cleveland.

hyperactive. He reported that he had been unable to keep his job "due to being explosive at work." *Id.* at 448.

Lillo had several counseling appointments with Dori Garey, LISW. At the initial September 18, 2012 visit, Lillo reported current symptoms of anger and violent outbursts, very poor frustration tolerance and poor mood modulation, lack of initiative to work, learning disabilities resulting in very limited reading ability and poor math skills. (R. 10, PageID #: 441-442.) Although Lillo was 24 years old, Garey's mental status assessment was that his behavior, mood and affect were more fitting for a young teen. Garey further assessed that Lillo's judgment, insight, and memory were all limited, and his attention, concentration and thought content were all compromised. *Id.* at 443.

At subsequent follow-ups with Garey, Lillo reported continued issues with anger, social anxiety, and poor sleep habits. He broke up with his girlfriend, who had been managing several aspects of his daily life, after she became unemployed. He continued to use marijuana, and admitted stealing from cars to finance his habit. (R. 10, PageID #: 438-441.)

Lillo had a psychiatric evaluation with Richard Hill, M.D., on November 14, 2012. (R. 10, PageID #: 435-437.) Lillo told Dr. Hill that he had trouble controlling his anger, that he was irritable, had angry outbursts and frequent fights. His only friend had been shot and killed in front of him, and he had nightmares. Lillo reported an abusive father, and mother who left home when he was 12. Lillo reported that he had stopped taking Depakote because it made him fat, and he felt like a zombie. *Id.* at 435. He had been living with his girlfriend, who supported him and maintained the household. *Id.* at 436. Dr. Hill prescribed Inderal, and stated psychotherapy was the main therapeutic goal. *Id.* at 437.

4

During a February 11, 2013 visit with Garey, Lillo admitted that he had stolen tools from his neighbor for drug money, and that he had spent New Year's Eve breaking into cars for the same purpose, while under the influence of eight Percocet. (R. 10, PageID #: 432.) When Garey suggested Lillo have an AOD (alcohol and other drug) assessment, get clean and attend meetings, Lillo became agitated and angry, and left, stating he would not return. Garey reported that Lillo is in denial about the interaction of his drug use and his unstable moods, and noted he expressed little remorse or intention to change. *Id.* at 432-433.

Lillo returned to Dr. Hill on March 12, 2013, complaining of side effects (nauseated, lightheaded, dizzy) from the Depakote and Propranolol. (R. 10, PageID #: 424-425.) He reported that he had stopped smoking marijuana. He appeared more calm, and was pleasant and cooperative. Lillo was still anxious, but his thoughts were logical and goal-directed. Dr. Hill discontinued the Depakote and Propranolol, and prescribed Lamictal. *Id.* at 425.

Lillo reported to Dr. Hill on April 11, 2013, that his mood was much better with Lamictal. He was less afraid to go outside, although he admitted continuing anger issues. Lillo appeared more calm, and was pleasant and cooperative. He appeared less anxious, and his thoughts were logical and goal-directed. The doctor increased his Lamictal dosage. (R. 10, PageID #: 508.)

Lillo continued to show progress during a visit with Dr. Hill on May 22, 2013, reporting that he was "doing pretty well," his moods had been more stable, and he had been less impulsive and aggressive. He continued to have difficulty with short-term memory. The doctor again increased his Lamictal dosage. (R. 10, PageID #: 505.)

On July 11, 2013, Dr. Hill noted Lillo continued to show "marked improvement," that Lamictal was helpful and stabilized his previous mood swings. Lillo did report difficulty falling

asleep, experiencing a "locked in" state for the previous two weeks, where he cannot move or speak when trying to fall asleep. Dr. Hill stated he would send Lillo to a sleep clinic. (R. 10, PageID #: 496.) However, on September 11, 2013, Lillo reported becoming more angry, irritable and explosive, returning to his previous level of functioning. He noted auditory hallucinations, limited to when he was trying to fall asleep. He had not yet gone to the sleep clinic. Dr. Hill noted he was "markedly improved" from his initial appointments, but his mood was deteriorating. (R. 10, PageID #: 621.)

Lillo reported on October 28, 2013, that he had "flipped out and went crazy" recently and cut his arm with a razor blade, with blood everywhere. Dr. Hill noted no marks were visible on Lillo's arm. Lillo reported small benefit from Lamictal, and Dr. Hill increased the dosage. The doctor placed a referral for psychotherapy, with a new therapist. (R. 10, PageID #: 619.)

On February 4, 2014, Lillo began therapy with Bruce Catalano, LISW. (R. 10, PageID #: 612-613.) Lillo reported that his 16-year-old sister had died, he had a severe panic attack, and he had not slept for four days. Lillo reported anger issues, and that when he gets very angry, he blacks out. *Id.* at 612. That same day, he also saw Dr. Hill, and reported he was suspicious of his sister's cause of death. Lillo reported that he was still taking the lower dosage of Lamictal, that he had not filled the increased dosage, and he was not taking Zoloft. *Id.* at 614. He still had not gone to the sleep clinic. *Id.* at 615.

Lillo did not return to Dr. Hill until May 6, 2014, at which time he appeared in filthy clothing, caked with dirt. (R. 10, PageID #: 610-611.) He reported that his grandmother died two days after his sister, and he tried to hang himself, but his girlfriend intervened. Lillo stated that he was not taking the Lamictal consistently, although when he did, it helped to moderate and

6

stabilize his mood. Dr. Hill advised him of the importance of taking Lamictal consistently. Lillo agreed to see his therapist more consistently as well.

At a June 10, 2014 appointment, Dr. Hill noted Lillo was slowly recovering from the deaths of his sister and grandmother, and that his mood was more stable. Lillo said he was taking Lamictal more consistently, and Ambien was helping him to sleep well, but he had not returned to the therapist as agreed. (R. 10, PageID #: 609.)

On September 17, 2014, Lillo reported his mood was variable, with crying spells and thoughts of hurting himself. Dr. Hill administered a Sage test, at which Lillo scored very low. He had not returned to the therapist. (R. 10, PageID #: 604-605.) On October 29, 2014, Lillo reported to Dr. Hill that he was very angry, that he had gotten into a fight, which resulted in his finger being cut by a knife. He expressed the desire for revenge against the other person. He had not taken Lamictal for the past few days, and had not slept for five nights. Lillo agreed to resume taking Lamictal, and was given seven Ambien. *Id.* at 602-603.

Two weeks later, on November 11, Lillo reported to Dr. Hill that he was taking the Lamictal and it was moderating his highs and lows. His mood was much improved, and Ambien helped greatly with his insomnia. (R. 10, PageID #: 598.) Lillo returned to therapist Catalano on November 20, and reported that Lamictal made him calmer, and he noticed mood changes without it. *Id.* at 595.

On January 13, 2015, Lillo reported to Dr. Hill that he had not been able to purchase his Lamictal and had not used it since his last appointment. His mood was more variable, he was frequently irritable and easily agitated. He had returned to smoking marijuana to calm down. (R. 10, PageID #: 589.) He was sleeping fairly well, and his mood, though somewhat irritable at times, was euthymic. *Id.* at 589-590.

7

B. Medical Opinions Concerning Claimant's Functional Limitations

Kevin Corbus, Ph.D., conducted a consultative exam with Lillo on May 20, 2011. (R. 10, PageID #: 400-405.) Lillo reported a history of learning difficulties, fighting, and delinquent offenses. *Id.* at 401. He stated he has been diagnosed with Bipolar Disorder and ADHD, with no history of mental health treatment. Lillo reported he did not work, and had never worked. Dr. Corbus noted that Lillo's behavior was "bizarre" at times, childlike at times, he does not like people, and wants to fight. Dr. Corbus stated Lillo's thought processes were "illogical, disorganized, coherent, and tangential." *Id.* at 402. Dr. Corbus assigned a final GAF of 35. *Id.* at 404.

Dr. Corbus opined Lillo is likely to have significant difficulties with job related tasks. (R. 10, PageID #: 404.) During the evaluation, Lillo was not able to concentrate on questions and tasks, was very distracted during the interview, and had difficulty answering basic questions. Dr. Corbus noted a significant history of fighting, and stated that Lillo was unlikely to respond appropriately to coworkers. Dr. Corbus noted that Lillo does not take medication to help manage his psychiatric symptoms, and would be unable to respond appropriately to work stressors. *Id.* at 405.

Treating psychiatrist Dr. Hill completed an assessment of Lillo's mental ability to sustain work-related activities, which was dated September 13, 2012. (R. 10, PageID #: 419-422.)[4] Dr. Hill opined that Lillo had no ability to understand and remember very short and simple instructions, to complete a normal workday without interruptions from his psychological symptoms, nor to maintain attention and concentration for extended periods. He had the ability to

---

[4] The assessment date is unclear, because page 1 indicates that "date of last appointment" was 9/11/2013, but Dr. Hill's signature line on page 4 contains the date 9/13/2012.

sustain an ordinary routine without supervision for less than twenty percent of a workday. *Id.* at 419-420. Dr. Hill commented that Lillo had very significant problems with immediate and recent memory, and that he became easily agitated when overwhelmed. *Id.* at 420.

Dr. Hill also noted that Lillo's social anxiety made any group or work situation problematic. His lack of working memory creates frustration and agitation, so any criticism from a supervisor would lead to a volatile situation. (R. 10, PageID #: 420.) He estimated that Lillo would likely be absent from work because of his impairments more than four times a month. *Id.* at 421. Dr. Hill stated that medication hopefully would lead to improved functioning. *Id.*

Michael Faust, Ph.D., conducted a consultative exam with Lillo on May 1, 2013. (R. 10, PageID #: 480-487.) Dr. Faust noted that recently completed psychological testing placed Lillo at borderline intelligence with a verbal IQ of 75 and performance IQ of 69. Lillo reported that his only job was stocking shelves at K-Mart for five weeks, before he was fired in November 2011, for lack of attention to work, misbehaving, and arguing with his boss. *Id.* at 481. Lillo reported he was compliant with his current medication, Lamictal. He reported difficulties with mood swings and anger, and difficulty falling asleep. *Id.* at 482. At the time of the exam, he was on probation for assault. Lillo reported a history of stealing, marijuana use, violence and aggression. *Id.* at 483.

Dr. Faust found Lillo to be cooperative during the interview, although he was depressed and irritable. He had no difficulty understanding questions or instructions, including complex instructions. (R. 10, PageID #: 483, 485-486.) Dr. Faust assigned him a GAF of 55, indicating moderate symptoms. *Id.* at 485. He indicated Lillo has lapses in sustained attention, which may make it difficult for him to fully remember and follow instructions. Dr. Faust noted that Lillo did not report any difficulties learning specific job duties. He found Lillo's level of attention and

9

concentration to be variable, and he struggled to stay focused. Dr. Faust opined that Lillo was irritable and depressed, and had limitations in his ability to respond to others in the workplace. *Id.* at 486. Although he was being treated with Lamictal, he continued to experience mood swings and PTSD symptoms. *Id.* at 486-487. Dr. Faust noted that exposures to work pressures may increase his mood disorder and PTSD symptoms, and Lillo did not have effective coping skills to manage emotional outbursts. *Id.* at 487.

Reviewing agency consultant, Robyn Hoffman, Ph.D., examined the medical record on June 3, 2013. (R. 10, PageID #: 166-173.) Claimant asserts the record was incomplete at the time. (R. 12, PageID #: 639.) Dr. Hoffman found moderate restrictions in activities of daily living; maintaining concentration, persistence, or pace; and marked difficulties in maintaining social functioning. (R. 10, PageID #: 167.) Dr. Hoffman determined that, although Lillo had understanding and memory limitations, he was not significantly limited in his ability to remember work procedures, or his ability to understand and remember very short and simple instructions. He was moderately limited in his ability to understand and remember detailed instructions, and in his ability to maintain attention and concentration for extended periods. Lillo was also moderately limited in his ability to complete a normal workday without interruptions from his symptoms. Dr. Hoffman opined Lillo was capable of simple routine tasks in a static work environment, with no production demands. He had no difficulty following simple and moderately complex tasks, although attention and concentration was variable. *Id.* at 171.

Dr. Hoffman also noted that Lillo was markedly limited in his ability to interact appropriately with the public. He was capable of occasional contact with coworkers and supervisors; but it would do best if tasks did not involve contact with others. Dr. Hoffman indicated Lillo should not work with the public. *Id.*

10

Dr. Hill completed a second assessment of Lillo's mental ability to sustain work-related activities on February 12, 2015. (R. 10, PageID #: 582-584.) Dr. Hill opined that Lillo had poor or no ability to function in almost every category of work-related mental activities. *Id.* at 582. He stated Lillo had very poor procedural memory, was easily overwhelmed or distracted, and becomes frustrated or angry, often toward others. Dr. Hill noted that Lillo's girlfriend served the role of "memory" for Lillo, did shopping, cooking, and interfaced with the world, because Lillo was incapable of doing so. Dr. Hill anticipated that Lillo's impairments would cause him to be absent from work "most every day." *Id.* at 583.

## IV. TESTIMONY OF VOCATIONAL EXPERT

A vocational expert ("VE") provided testimony during the hearing. (R. 10, PageID #: 130-140.) The ALJ stated that Lillo had no past relevant work. The ALJ posed a hypothetical question concerning an individual of Lillo's age and education, with no work experience, only non-exertional limitations, and the ability to perform simple repetitive tasks but not at a production rate pace. The person can occasionally interact with coworkers and supervisors, but cannot interact with the public; and can work in an environment that has only occasional changes in the work setting. *Id.* at 132.

The VE testified that, within those limitations, there would be a number of positions in the cleaning occupations. First, kitchen helper, DOT number 318.687-010, medium, unskilled, SVP 2. There are at least 200,000 jobs nationally, and 10,000 in the state of Ohio. (R. 10, PageID #: 133.) Another would be a car washer, DOT 919.687-014, medium, unskilled, SVP 1. There are at least 100,000 jobs nationally, and 2,000 in the state of Ohio. *Id.* at 133-134. A third example given was housekeeping/cleaner, DOT number 323.687-014, light, unskilled, SVP 2,

11

but the VE reduced the job numbers by half because there is contact with the public in some of the jobs. There would be approximately 2,000 jobs in Ohio, and nationally about 100,000. *Id.* at 134.

The ALJ then modified the hypothetical to add restrictions for no exposure to pulmonary irritants such as concentrated dust, odors, fumes, humidity and wetness. (R. 10, PageID #: 134.) The VE responded that the car washer would be eliminated based on constant exposure to wetness, and the kitchen helper would be eliminated based on frequent exposure to wetness (and occasional exposure to cold, which the ALJ had not added). *Id.* at 135.

The ALJ then asked if there were other jobs the hypothetical individual could do, in addition to housekeeping/cleaner. (R. 10, PageID #: 135.) The VE then identified a mail room clerk (non-post office), DOT 209.687-026, which is light, unskilled, SVP 2. Nationally, at least 105,000 jobs, and in the state, 900 jobs. Another job was a food vending attendant, DOT 319.464-014, light, unskilled, SVP 2. In the nation, 41,000 jobs, and in the state, 600 jobs. *Id.* at 136.

The claimant's attorney posed a hypothetical based on an individual who is unable to carry out short, simple instructions without frequent reminders; is unable to maintain attention and concentration for more than an hour; is unable maintain regular attendance and punctuality; cannot work in the presence of other people; cannot respond appropriately to criticism from employers, or changes in a routine work setting; and cannot maintain socially appropriate behavior. Counsel asked if such a person would be able to engage in competitive employment. (R. 10, PageID #: 139-140.) The VE stated that there would be no jobs for such a person. *Id.* at 140.

V.    ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in her May 12, 2015,

decision:

1.  The claimant, Roberto L. Lillo, has not engaged in substantial gainful activity at any time since March 28, 2011, when he filed the first of the above two referenced applications for supplemental security income (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: borderline intellectual functioning, an affective disorder (bipolar disorder), an anxiety disorder, a personality disorder, and a substance use disorder (cannabis abuse in reported recent remission) (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.  With the exception of briefer periods of less than 12 continuous months, the claimant has retained the residual functional capacity since March 28, 2011, when he filed the first of the above two referenced applications for supplemental security income, to perform all the basic work activities described in 20 CFR 416.921 and 416.945 without any exertional limitations subject to the following restrictions/ limitations:  he can perform simple, repetitive tasks in jobs where the tasks do not have to be performed at a production rate pace, and in jobs where he does not have to have more than occasional interactions with co-workers and/or supervisors, and in jobs where he does not have to interact with members of the public except for incidental contacts, and in jobs where there are no more than occasional changes in the work setting.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant has been considered to be a younger individual in the "18 to 49" age group ever since March 28, 2011, when he filed the first of the above two referenced applications for supplemental security income (20 CFR 416.963).

7.  The claimant has a limited education, and he is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue in this case because the claimant has no past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the economy that the claimant has been able to perform since March 28, 2011, when he filed the first of the above two referenced applications for supplemental security income (20 CFR 416.969, and 416.969(a)).

10.  The claimant, Roberto L. Lillo, has not been under a disability, as defined in the Social Security Act, at any time since March 28, 2011, when he filed the first of the above two referenced applications for supplemental security income (20 CFR 416.920(g)).

(R. 10, PageID #: 83, 88, 90, 93-95.)

## VI.    DISABILITY STANDARD

A claimant is entitled to receive SSI benefits only when he establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 416.905(a).

Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a disability determination. *See* 20 C.F.R. § 416.920(a); *Heston v. Comm'r Soc. Sec. Admin.*, 245 F.3d 528, 534 (6th Cir. 2001). The Sixth Circuit has outlined the five steps as follows:

First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled. *Id.* § 404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv). Fifth, the ALJ determines

14

whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(v).

The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

*Wilson v. Comm'r Soc. Sec. Admin.*, 378 F.3d 541, 548 (6th Cir. 2004); *see also* 20 C.F.R. § 416.920(a)(4).

VII.    STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence. *Blakley v. Comm'r Soc. Sec. Admin.*, 581 F.3d 399, 405 (6th Cir. 2009)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence, but less than a preponderance of the evidence. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Wright*, 321 F.3d at 614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Wright*, 321

15

F.3d at 614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). The court, however, may examine all the evidence in the record, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *Hubbard v. Comm'r Soc. Sec. Admin.*, No. 11-11140, 2012 WL 883612, at *5 (E.D. Mich. Feb. 27, 2012) (quoting *Heston*, 245 F.3d at 535).

## VIII.    ANALYSIS

Lillo's case raises multiple alleged errors for review. His primary arguments are that (1) the ALJ applied an improper legal standard when evaluating Lillo's mental impairments, misapplied the 12-month durational requirement, and failed to properly analyze Lillo's mental disorders; (2) the RFC does not portray Lillo accurately and is not supported by substantial evidence because, according to Lillo, the ALJ failed to address the issue of sustainability; and (3) the ALJ committed legal error when evaluating the opinion of the treating psychiatrist. (R. 12, PageID #: 629.) After carefully considering the Plaintiff's and Commissioner's arguments, as set forth below, the court recommends remanding this case for further proceedings because the ALJ did not articulate good reasons for discounting the opinions from Lillo's treating psychiatrist. Remanding the case for reconsideration, may also necessitate reconsideration of the ALJ's RFC and further determinations, as addressed herein.

Lillo contends the ALJ applied the wrong legal standard in evaluating his mental impairments. (R. 12, PageID #: 641-645.) The ALJ found that Lillo had severe impairments including borderline intellectual functioning, bipolar disorder, anxiety disorder, and a personality disorder. (R. 10, PageID #: 83.) The ALJ determined that, with the exception of briefer periods of less than twelve continuous months, the claimant retained the residual functional capacity to

16

perform simple, repetitive job tasks. *Id.* at 90. Lillo argues that the ALJ improperly reached that conclusion by failing to correctly apply the 12-month durational requirement to his severe mental impairments. (R. 12, PageID #: 641.)

Under the Social Security Act, disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... can be expected to last for a continuous period of not less than twelve months." *Gatliff v. Comm'r Soc. Sec. Admin.*, 172 F.3d 690, 692 (9th Cir. 1999) (quoting 42 U.S.C. § 1382c(a)(3)(A)); *Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986). The statute requires that a claimant's disability, or impairment, last at least twelve months. *Pagan v. Bowen*, 862 F.2d 340, 346 (D.C. Cir. 1989). In other words, it is the impairment, not the symptoms, which must meet the 12-month requirement. *Pagan*, 862 F.2d at 346 (citing 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.920(d)); *Singletary*, 798 F.2d at 821; *see also Barnhart v. Walton*, 535 U.S. 212, 218-219 (2002). The statute requires both that the impairment must last twelve months, and that the impairment must be severe enough to prevent claimant from engaging in substantial gainful activity during that twelve months. *Barnhart*, 535 U.S. at 218-219.

Courts have noted that mental illness is not generally a static condition. *Dwyer v. Apfel*, 23 F. Supp.2d 223, 229 (N.D. N.Y. 1998) (frequency and severity of symptoms can change over time). Bipolar disorder, for example, usually lasts a lifetime, and mood episodes of mania and depression typically recur. *Pierson v. Colvin*, No. 3:13CV00319, 2015 WL 418079, at *6 (S.D. Ohio Jan. 30, 2015), *adopted by* 2015 WL 1290903 (S.D. Ohio Mar. 18, 2015). Between episodes, a person with bipolar disorder may be free of symptoms. Indeed, periods of symptom

17

remission or improvement is a typical feature of bipolar disorder. *Id.  See also Singletary*, 798 F.2d at 821.

Although a claimant whose claim is based on mental impairments does not have to show "a 12-month period of impairment unmarred by any symptom-free interval," the claimant must still show medical evidence that indicates the mental condition is a long-term problem. *Singletary*, 798 F.2d at 822. Symptoms can be greatly reduced in severity without negating the existence of an impairment, even when a person becomes stable enough to hold a job for a limited period. *Pagan*, 862 F.2d at 350. The D.C. Circuit has stated:

> Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse. Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.

*Pagan*, 862 F.2d at 350 (quoting *Poulin v. Bowen*, 817 F.2d 868, 875 (D.C. Cir. 1987)).

In addition, finding that a claimant is able to engage in substantial gainful activity ("SGA") requires more than a simple determination that the claimant can physically perform certain jobs. It also requires that the claimant can hold, for a significant period, whatever job he finds. *Dinsmore v. Comm'r Soc. Sec. Admin.*, No. 1:08CV00422, 2009 WL 2057722, at *14 (S.D. Ohio July 14, 2009) (citing *Singletary*, 798 F.2d at 822, and other cases); *see also Gatliff*, 172 F.3d at 693-694 (citing *Parish v. Califano*, 642 F.2d 188, 192 (6th Cir. 1981), and other cases); *Pagan*, 862 F.2d at 350.  The SSA considers short-term jobs that end within three months because of the claimant's impairments to be "unsuccessful work attempts," that are not evidence of an ability to engage in SGA. *Gatliff*, 172 F.3d at 694; *Dinsmore*, 2009 WL 2057722, at *14.

Lillo argues that, by definition, "his impairments lasted a continuous period of 12 months, otherwise they could not have been considered severe." (R.12, PageID #: 643, citing 20

C.F.R. § 416.905(a)). That is not accurate. Section 416.905(a) defines disability, not the severity of an impairment. The severity of an impairment is assessed at the second step of the disability analysis, to determine whether the impairment significantly limits the claimant's ability to do basic work activities, and is thus severe. 20 C.F.R. §§ 416.920(a)(ii), (c). The duration requirement is separately considered. 20 C.F.R. §§ 416.920(a)(ii), 416.909. In other words, simply determining that a claimant has a severe impairment does not obviate the need to meet the duration requirement. It is the claimant's burden of establishing a prima facie case of disability both as to the impairment and as to the duration. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert. denied,* 517 U.S. 1122 (1996).

According to the ALJ's decision, the record demonstrated that Lillo's mental functioning was not incompatible with the ability to do any gainful activity. (R. 10, PageID #: 85-88.) The ALJ determined that, over any continuous 12-month period relevant to her decision, Lillo's mental impairments caused no more than moderate restrictions in activities of daily living, and in his ability to maintain concentration, persistence, or pace *(id.* at 85, 87), and no more than marked social functioning problems (*id.* at 86). In addition, Lillo's mental impairments had caused no episodes of decompensation since March 28, 2011. *Id.* at 87.

Thus, while the ALJ found that "allegations that the claimant has had disabling symptomatology at any time since March 28, 2011," were not substantiated by the objective evidence in the record, and not entirely credible, the ALJ also "expressly [did] not find credible allegations that the claimant's impairments . . . would have caused any work-related limitations not identified in the [RFC] over any continuous 12-month period relevant to this decision." (R. 10, PageID #: 91, emphasis added.) Moreover, the ALJ stated, "the evidence as a whole shows

19

that the claimant's mental functioning has improved when he has complied with prescribed medical treatment." *Id.* at 92.

It is claimant's burden to demonstrate that his bipolar disorder, or other mental impairments, prevented him from performing substantial gainful activity for twelve continuous months. 20 C.F.R. § 416.905(a); *Walters,* 127 F.3d at 529 (claimant bears burden of proof during first four steps). Lillo pointed to no evidence to meet his burden in his brief on the merits. *See* doc. 12, PageID #: 641-643.

In his reply brief, Lillo asserts, "At no time did the ALJ find that his severe impairments did not last twelve consecutive months, consequently, Mr. Lillo met the twelve month requirement." (R. 16, PageID #: 679.) Claimant's argument is misguided. It is not the Commissioner's burden to establish that fact, but rather it is the claimant's burden. 20 C.F.R. § 416.905(a); *Roberts,* 66 F.3d at 182; *Walters,* 127 F.3d at 529.

Lillo also states that, because "his impairments fluctuated between moderate and marked," the ALJ was required to evaluate the longitudinal course of his mental disorders. (R. 16, PageID #: 680.) Lillo contends that, because there was variability in his symptoms, the ALJ should have evaluated the trajectory of his illness, and the response to medication necessary to treat it. *Id.* at 683, citing *Gentry v. Comm'r Soc. Sec. Admin.,* 741 F.3d 708, 723 (6th Cir. 2014).

The ALJ did so. The medical evidence supports the ALJ's determination that Lillo's mental functioning improved when he complied with prescribed treatment. (R. 10, PageID #: 92.) The overall trajectory of his condition was positive. For example, during the first year of his mental health treatment, Lillo was using marijuana daily, which contributed to his unstable moods. (*See, e.g. Id.* at PageID#: 436, 442, 532, 538, 542). Once his physician, Dr. Hill,

20

identified the proper medication and Plaintiff refrained from marijuana use, Lillo's condition generally improved over time. (*See, e.g. Id.* at PageID#: 493, 505, 508.)

Lillo contests the characterization that his health was improving over time. (R. 16, PageID #: 681.) He points out that, at an April 2013 visit, he continued to have anger management issues. However, at that visit, Lillo reported to Dr. Hill that his mood was much better with Lamictal, and he was less afraid to go outside, although he admitted continuing to have anger problems. (R. 10, PageID #: 508.) Lillo continued to show progress at a visit with Dr. Hill the next month, reporting that he was "doing pretty well," his moods had been more stable, and he had been less impulsive and aggressive. *Id.* at 505.

Lillo also notes that he reported difficulty falling asleep, experiencing a "locked in" state in July 2013. (R. 16, PageID #: 681; R. 10, PageID #: 496.) Dr. Hill recommended Lillo go to a sleep clinic, but six months later Lillo still had not followed that treatment recommendation. (R. 10, PageID #: 496, 621, 615.) Otherwise, Dr. Hill noted that Lillo continued to show "marked improvement," and Lamictal had stabilized his previous mood swings. *Id.* at 496.

There is consistent evidence that most of the instances Lillo characterizes as "the fluctuating nature" of his impairments (R. 16, PageID #: 682), were the result, at least in part, of Lillo's failure to take his prescribed medications. *See, e.g.*, R. 10, PageID #: 610-611 (not taking Lamictal consistently; when he did, it helped to stabilize his mood); *id.* at 609 (taking Lamictal more consistently, mood was more stable; Ambien helping him sleep well); *id.* at 602-603 (had not taken Lamictal for days); *id.* at 598 (mood much improved, taking Lamictal; Ambien helped greatly with insomnia); *id.* at 595 (Lamictal made him calmer, noticed mood changes without it); *id.* at 589 (had not taken Lamictal for weeks, mood more variable, frequently irritable).

Lillo argues that the ALJ is required to evaluate the reasons for his noncompliance with his prescribed treatment. (R. 16, PageID #: 682, citing 20 C.F.R. § 416.930). He offers several reasons why he had not taken various medications. *Id.* at 683. However, in response to his complaints concerning the side effects (light-headed, nauseated) from Depakote, the prescription was changed to a different medication. (R. 10, PageID #: 605, 511.) Regarding a complaint that medication upset his stomach, LISW Catalano suggested he not take the medication on an empty stomach (*Id.* at 59), and Lillo did not raise that complaint again. As to the allegation that the medicine made him slow down, Lillo's underlying reason for not taking his medicine at that point was that he wanted to maintain an angry mood, to help him get revenge against someone he had fought with, and after a long discussion, he agreed to resume taking Lamictal. *Id.* at 602-603.

In any event, the basis of the ALJ's decision in this regard was not Lillo's failure to follow prescribed treatment. *See generally* 20 C.F.R. § 416.930(b). Rather, the ALJ simply found that "the evidence as a whole shows that the claimant's mental functioning has improved when he has complied with prescribed medical treatment." (R. 10, PageID #: 92.) That finding is supported by substantial evidence in the record.


A. <u>Sustainability</u>

Lillo also argues that the ALJ failed to address the issue of sustainability, that is, whether he can perform work activity on a regular and sustained basis. (R. 12, PageID #: 645-647.) Lillo contends that the ALJ failed to meet the Step Five burden to show that work existed in the national economy that he could perform. *Id.* at 646. He points to the ALJ's statement: "With the exception of briefer periods of less than 12 continuous months, the claimant has retained the residual functional capacity . . . to perform . . . basic work activities [etc.]." (R. 12, PageID #:

646, citing R. 10, PageID #:90.) Lillo argues that the 12-month "exception" phrase above indicates that the ALJ admits that Lillo cannot perform the RFC all the time. *Id.* at 646-647.

The ALJ determined the record demonstrated that Lillo's mental functioning was not incompatible with the ability to perform any gainful activity. (R. 10, PageID #: 85-88.) The ALJ concluded that, over any continuous 12-month period relevant to her decision, Lillo's mental impairments caused <u>no more than</u> moderate restrictions in activities of daily living, and in his ability to maintain concentration, persistence, or pace, and <u>no more than marked</u> social functioning problems, although his mental functions did vary in severity. (*Id.* at 85-87, emphasis added.) In other words, the variance(s) at worst did not rise to a degree of limitation considered incompatible with the ability to do SGA.

The ALJ "expressly [did] not find credible allegations that the claimant's impairments . . . would have caused any work-related limitations not identified in the [RFC] over any continuous 12-month period relevant to this decision." (R. 10, PageID #: 91.) The ALJ also stated, "the evidence as a whole shows that the claimant's mental functioning has improved when he has complied with prescribed medical treatment." (*Id.* at 92.) The ALJ concluded that Lillo's ability to perform work at all exertional levels had not been compromised by his non-exertional limitations. (*Id.* at 95.) The ALJ, therefore, found that Lillo was capable of sustained SGA.

The ALJ's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues differently, or substantial evidence also supports the opposite conclusion. *Bass*, 499 F.3d at 509; *Mullen*, 800 F.2d at 545. However, because this case must be remanded for a fuller consideration of the treating physician's opinion (see below), the issue of sustainability, related to Lillo's daily activities and social functioning, may also need to be revisited.

23

B.  <u>Treating Physician Rule</u>

The claimant contends that the ALJ committed legal error in evaluating the opinion of his treating psychiatrist. (R. 12, PageID #: 647-652.) The Commissioner notes that a treating physician's opinion is only entitled to controlling weight if it is medically well-supported and not inconsistent with other evidence in the record. (R. 14, PageID # 671.) The Commissioner contends that Dr. Hill's opinions lacked support in the longitudinal record, and that the limitations assessed by Dr. Hill were inconsistent with Lillo's daily activities, the absence of any psychiatric hospitalizations, and evidence that he maintained good concentration. *Id.* Additionally, the Commissioner argues that Lillo's documented improvement when he complied with prescribed treatment contradicts Dr. Hill's findings. *Id.* at 672.

It is well-recognized that an ALJ must generally give greater deference to the opinions of a claimant's treating physicians than to non-treating physicians. *Gayheart v. Comm'r Soc. Sec. Admin.*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544. This doctrine, often referred to as the treating physician rule, is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treatment relationship with an individual are often equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. § 416.927(c)(2). The treating physician doctrine requires opinions from treating physicians to be given controlling weight where the opinion is: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)); *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544.  In other words, treating physicians' opinions are only given deference when supported by objective

24

medical evidence. *Vance v. Comm'r Soc. Sec. Admin.*, No. 07-5793, 2008 WL 162942, at *3 (6th Cir. Jan. 15, 2008) (citing *Jones v. Comm'r Soc. Sec. Admin.*, 336 F.3d 469, 477 (6th Cir. 2003)).

Even when a treating source's opinion is not entitled to controlling weight, an ALJ must still determine how much weight to assign to the opinion by applying specific factors set forth in the governing regulations. *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 416.927(c). Social Security regulations require the ALJ to give good reasons for discounting evidence of disability submitted by the treating physician(s). *Blakley*, 581 F.3d at 406; *Vance*, 2008 WL 162942, at *3. Those good reasons must be supported by evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight assigned to the treating physician's opinion, and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Blakley*, 581 F.3d at 406-407; *Winning v. Comm'r Soc. Sec. Admin.*, 661 F.Supp.2d 807, 818-819 (N.D. Ohio 2009) (quoting SSR 96-2p).

It is in this respect that the court considers the ALJ's decision lacking. The ALJ, as an initial matter, assigned "great weight" to the opinions of the agency reviewing psychologists, and the consultative examiner Dr. Faust. (R. 10, PageID #: 92.) Although the ALJ's decision referenced the opinions of Lillo's treating psychiatrist, Dr. Richard Hill, in multiple sections, the decision lacks sufficiently specific explanation for the reasons she discounted such opinions. As such, the ALJ did not articulate good reasons, supported by record evidence, for discounting the opinions. Here are the four excerpts from the ALJ's decision in which the ALJ addressed and discounted the treating psychiatrist's opinions:

> In assessing the impact the claimant's mental impairments have had on his ability to carry out activities of daily living, I have also considered the fact that a treating psychiatrist offered the speculative opinion on February 12, 2015, that the claimant would likely not be able to living [*sic*] by himself (see Ex. B13F, p. 2; see also Ex. B7F, pps. 2 to 4). However, I am not persuaded by arguments that the longitudinal record, including this source's opinions, supports a finding that the

claimant's mental impairments have caused more than moderate difficulties with respect to his ability to carry out activities of daily living over any continuous 12-month period relevant to this decision.

(R. 10, PageID #: 85.)

In assessing the impact the claimant's mental impairments have had on his ability to interact with and/or relate to others, I have also considered the opinions that the above-mentioned treating psychiatrist offered on September 13, 2012 and February 12, 2015 (see Exs. B7F and B9F). However, I am not persuaded by arguments that the longitudinal record, including this source's opinions and records, supports a finding that the claimant's mental impairments have caused extreme social functioning problems over any continuous 12-month period relevant to this decision.

(R. 10, PageID #: 86.)

In assessing the impact the claimant's mental impairments have had on this area of functioning, I have also considered and given some weight to the opinions that the above-mentioned treating psychiatrist offered on September 13, 2012, and February 12, 2015 (see Exs. B7F and B9F). However, I am not persuaded by arguments that the longitudinal record, including this source's opinions and records, supports a finding that the claimant's mental impairments have caused marked or extreme difficulties with respect to this area of functioning over any continuous 12-month period relevant to this decision.

(R. 10, PageID #: 87.)

In contrast to the great weight I have given to the above-referenced medical source opinions, I have given lesser weight to opinions that the above-mentioned treating psychiatrist offered on September 13, 2012, and February 12, 2015, for the same reasons given above in the Finding 2 discussion, namely the longitudinal record does not support this source's most restrictive opinions.

(R. 10, PageID #: 92.)

The first three excerpts are conclusory determinations that lack sufficient reference to

specific reasons for discounting the treating psychiatrist's opinions. Regarding the last excerpt,

the ALJ cross-references Finding 2 of the decision. In the ALJ's "Finding 2 discussion," she

discussed the severity of Lillo's impairments, and determined that his mental impairments

caused no more than moderate restrictions in activities of daily living, and in his ability to

maintain concentration, persistence, or pace. (R. 10, PageID #: 85, 87.) The mental impairments, as the ALJ noted, caused no more than marked social functioning problems. (*Id.* at 86.)

The ALJ rejected the opinions from treating psychiatrist, Dr. Hill, that Lillo would not be able to live by himself. (R. 10, PageID #: 85, citing PageID #: 583.) The ALJ stated that Lillo has survived periods of homelessness, he is able to take care of his personal needs, to shop in stores, to assist with the raising of his daughter, and to socialize with others. (*Id.* at 86.) The record evidence, however, does not support the ALJ's statements, with the exception that he has survived periods of homelessness.

As one example, the ALJ states that Lillo "assists with the raising of his minor daughter," with a supporting reference to a March 12, 2011, third-party function report, submitted by his girlfriend. (R. 10, PageID #: 288-296.) Lillo's girlfriend does state that Lillo is "pretty good" when his daughter visits. She also mentions that, when the daughter visits, "I'm there for anything, but he does pretty good [with] her." However, she further reports that when Lillo wakes, he starts yelling that life sucks, and he should just kill himself, because he hears his deceased niece and grandfather talking to him. (*Id.* at 289.) The girlfriend reported he needs reminders to brush his teeth, and that he only cooks, on average, one meal a week. He cannot cook anything that takes time, because he will get angry and throw it all into the garbage. The only household chore he performs is taking out the garbage. (*Id.* at 291.) She reports he does not go out very often, only to see family or for appointments. He does not shop, he cannot pay bills or count change. (*Id.* at 292.) The record also indicates he was not on medication at that time. The court, however, does not view such records as substantial evidence to support the ALJ's determination.

The ALJ also cites an April 12, 2011, function report filled out by Lillo. (R. 10, PageID #: 301-308.) The citation is presumably to "Personal Care," where Lillo checked the box that he has "No Problem" with personal care. (*Id.* at 302.) But he also reports that he does not prepare his own meals, because when he tries to cook it makes him angry and stresses him out. He takes the garbage out weekly, when his girlfriend tells him to. (*Id.* at 303.) He does not shop, because he does not know math. (*Id.* at 304.)

Another record the ALJ relied upon is an April 11, 2013, function report, submitted by his girlfriend. (R. 10, PageID #: 323-330.) On the cited pages, she states, "he is extremely aggressive or extremely sad," going from one extreme to other. He has a hard time focusing and retaining information; and, he lost his only job due to his temper and lack of focus. (*Id.* at 323.) Specifically concerning his daily activities, the girlfriend reports that he listens to music, or watches TV, and will feed the dog. Otherwise, she reports, "I do everything on a daily basis, he helps maybe 2X a week." Insofar as his personal care, she states that he can physically do it for himself, but she must prompt him ("ex. reminding him to brush his teeth, otherwise he will go days without doing it, but he can physically do it himself"). (*Id.* at 324.) He does not go out alone, because he gets paranoid, or angry and upset. As for shopping, he can buy chips and pop at the corner store, which he does twice a week. He does not understand how to manage money, and gets frustrated when she tries to teach him how to pay a bill. (*Id.* at 326.)

The ALJ also cites a September 17, 2013, function report filled out for Lillo by the girlfriend. (R. 10, PageID #: 340-347.) As to personal care, Lillo reports he does not have the urge to do anything or go anywhere, but he can shower and get dressed. His girlfriend cooks, although he can use the microwave. (*Id.* at 341.) He needs reminders to take a shower, and to take his medications. (*Id.* at 342.) He does not go out, because he gets paranoid. He reports that

he does "shopping," namely, for chips and pop, once or twice a week. He does not know how to handle money, pay bills or maintain a bank account. (*Id.* at 343.)

The ALJ also refers to a consultative internal medicine exam by Edward Butler, M.D., on July 26, 2011, where Lillo reported that his girlfriend cooks and does the laundry, but Lillo "does child care with his daughter once a week," and dresses and showers himself daily. He listens to TV and the radio, "plays sports and socializes with friends." (R. 10, PageID #: 409-410.)

Finally, the ALJ cites September 18, 2012, progress notes from the therapist Garey, who noted that his current symptoms included anger and violent outbursts, and very poor frustration tolerance. Garey indicated that Lillo currently lives with his "very indulgent girlfriend," who mothers him, cleans up after him, and supports him. As to daily activities, Garey noted that Lillo does not support himself, or clean up after himself. His girlfriend does his hair, and cleans up when he has broken objects in anger. He cannot manage his own anger or anxiety. (R. 10, PageID #: 442.)

These examples, which the ALJ cites in support of her conclusion that Lillo can, among other things, "take care of his personal needs, and shop in stores," do not constitute substantial evidence to support such conclusions. It would be an exaggeration to state, for example, that stopping in a store for two minutes once or twice a week to buy chips and pop (e.g., R. 10, PageID #: 343) shows that a claimant can do his own shopping for groceries and other household needs. In fact, several of the records the ALJ cited contain information that directly contradicts the ALJ's conclusion concerning Lillo's abilities of daily living. *See, e.g.*, *id.* at 442.

The court finds that the ALJ has not provided good reasons, supported by evidence in the case record, for not giving greater weight to the opinions of the treating psychiatrist, Dr. Hill.  As such, the court will forgo a more extensive analysis of the ALJ's discussion of Lillo's other

29

abilities at Step Two. Although the record as a whole may ultimately contain substantial evidence to support a determination that Lillo is not disabled, the ALJ's decision lacks sufficient explanation regarding the treating psychiatrist's opinions and the justification for discounting such opinions.

## IX.    CONCLUSION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner as a whole is not supported by substantial evidence. The court concludes that the ALJ's decision fails to articulate good reasons, supported by evidence in the case record, for not giving greater weight to treating psychiatrist Dr. Hill's opinions. The court, however, finds substantial evidence supports the ALJ's determination that the record evidence demonstrates Lillo's mental functioning has improved when he complies with prescribed medical treatment. (R. 10, PageID #: 92.)

Accordingly, the undersigned recommends that the decision of the Commissioner be **REMANDED** for a fuller explanation of the weight given to the opinions of the treating psychiatrist, Dr. Hill, and the reasons for such determination.

Date:  June 29, 2017                                s/ *David A. Ruiz*
                                                            David A. Ruiz
                                                            United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice. Failure to file objections within the

30

specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).